Filed 10/10/24  P. v. Loera CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>CANDIDO RODRIGUEZ LOERA,<br><br>    Defendant and Appellant. | F087320<br><br>(Super. Ct. No. VCF028584B-96)<br><br><br>**OPINION** |

-ooOoo-

THE COURT\*

APPEAL from an order of the Superior Court of Tulare County.  Nathan G. Leedy, Judge.

Sylvia W. Beckham, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Erin Doering, Deputy Attorney General, for Plaintiff and Respondent.

-ooOoo-

---

\*        Before Detjen, Acting P. J., Meehan, J. and Snauffer, J.

## **INTRODUCTION**

In 1996, appellant and defendant Candido Rodriguez Loera (appellant) was convicted after a jury trial of second degree murder with a prior strike conviction. He was sentenced to the second strike term of 30 years to life.

In 2023, appellant filed a petition for resentencing pursuant to Penal Code[1] section 1172.6. The trial court found his petition stated a prima facie case and set an evidentiary hearing. At the hearing, the court considered the transcript of appellant's jury trial, and new evidence introduced by both parties; appellant also testified at the hearing. The court denied the petition and found appellant was still guilty of second degree murder beyond a reasonable doubt after the statutory amendments to sections 188 and 189.

On appeal, appellate counsel filed a brief which summarized the facts and procedural history with citations to the record, raised no issues, and asked this court to independently review the record pursuant to both *People v. Delgadillo* (2022) 14 Cal.5th 216 and *People v. Wende* (1979) 25 Cal.3d 436. Appellant filed a supplemental brief. We address his contentions, independently review the record, and find the trial court's conclusions are supported by substantial evidence and affirm the denial of his petition.

## **FACTS[2]**

"The chief prosecution witnesses were Raul Caraballo (Raul), Mike Caraballo (Mike) and Monty Mitchell (Mitchell). Raul, a 29-year-old methamphetamine user and former dealer, testified under a grant of immunity from the district attorney. He admitted participating in a San Jose robbery with [codefendant Peter "Chino"] Cordova. Mike

---

**1**    All further statutory citations are to the Penal Code unless otherwise indicated.

**2**    After notice to the parties and without objection, this court takes judicial notice of our own records and the nonpublished opinion in appellant's direct appeal, *People v. Loera et al.* (Mar. 1, 1999, F027432) (*Loera et al.*), from which the following facts are taken. At the evidentiary hearing, the trial court relied on the record from appellant's jury trial and additional evidence introduced by the parties when it denied his petition.

agreed to testify in exchange for use immunity in this case and a 25 percent reduction in his sentence in a pending federal carjacking case. Mitchell, a parole absconder, testified under a grant of immunity.

"In August 1995, Raul was trying to get back into the methamphetamine dealing business by serving as the middleman for a group attempting to establish a methamphetamine manufacturing lab. The victim, Ronnie Soliz (Soliz), a friend of Raul's brother, Mike, put Raul in contact with 19-year-old Cordova, who was known as 'Chino,' and Thomas Fuentes (Fuentes), who was known as 'Conejo,' who would help put the lab together. Raul contacted Mitchell, an old acquaintance, who agreed to serve as 'cook' for the methamphetamine lab with the help of his friend Jerry McKiernan (McKiernan).

"Cordova was affiliated with the Northern Structure, a prison gang. He told Raul that his organization would get the necessary funds for the operation. According to Rinaldo Rivera, a correctional sergeant at Wasco State Prison and an institutional gang investigator, the Northern Structure was an Hispanic prison gang which originated at Folsom Prison in 1985. Paroled gang members recruit nonprisoners to deal narcotics to make money to support incarcerated gang members. Cordova had never been to prison. The Northern Structure code of ethics required members not to disclose anything except to another gang member. Soliz and Cordova had Northern Structure tattoos.

"To obtain cash for the methamphetamine operation, Soliz, Fuentes, Mike and someone named Panchito robbed the First Interstate Bank in Porterville on September 19, 1995, taking about $8,000. The men returned to the apartment where Soliz was staying to count and divide the money. Cordova was there to collect a percentage of the proceeds for his organization.

"Afterwards, Soliz bragged about the robbery. When he repaid the $20 he owed neighbor April Peralta, he told her he had robbed a bank. Peralta thought he was joking. However, later that day, when Mike purchased methamphetamine from Peralta for Soliz

3.

and himself, Peralta told Mike she had heard he had robbed a bank. Mike became upset and said Soliz talks too much. 'We're going to have a meeting about this.'

"Mike told Cordova about Soliz's disclosures. The bank had offered a reward and Mike feared someone would talk and they would be arrested. Monica, one of Soliz's roommates, told Cordova that Soliz was getting high—he used methamphetamine—and opening his mouth to people he should not.

"The day after the robbery, Cordova assembled the group at the apartment in Porterville where Soliz stayed. Cordova was armed with a large handgun. He showed the group a newspaper article about the robbery and angrily told them to keep their mouths shut. Cordova shamed Soliz, telling him he was not a man; he could not keep his mouth shut. Out of Soliz's presence, Cordova told various people it was time to take care of Soliz; he had to go." (*Loera et al.*, *supra*, F027432, at pp. 2–4.)

**Arrival at Appellant's Home**

"That afternoon, Raul drove Cordova, Mitchell and McKiernan to [appellant's] home in Tonyville. According to Mitchell, the purpose of the trip was to evaluate [appellant's] house as a possible site for the methamphetamine lab. During the drive, Cordova said Soliz had to be taken care of and asked what was the best way to do it. McKiernan suggested giving Soliz an overdose of heroin to teach him a lesson but not kill him. Mitchell and McKiernan felt a killing would generate 'heat' which would be bad for the proposed methamphetamine business. Someone suggested they inject Soliz with heroin to make him groggy and throw him in a canal so he would drown. Cordova asked McKiernan, who knew the most about heroin, what doses of heroin would make a person groggy or kill him. McKiernan said it depended on whether the person was accustomed to the drug. In Soliz's case, a one-fourth gram of heroin would be enough because he was not a regular user. Neither Mitchell nor Mike believed Cordova would actually kill Soliz. Cordova 'was always talking about how he wanted to kill [Soliz]' and others but never did.

"When they arrived at [appellant's] house, Cordova spoke with [appellant] privately and then left. Later that day, Raul, Cordova, Mike and Fuentes brought Soliz to [appellant's] house. Soliz was drunk. The men began to 'party' and drink beer. Cordova sent [appellant's] roommate to purchase heroin. When he returned, Cordova announced to the group that they had obtained a 'new issue' of heroin which needed to be sampled. McKiernan would sample one type and Soliz was to sample the other. Soliz protested but Cordova 'jumped' on him saying he had bragged about using heroin a couple of time and he was going to test if whether he wanted to or not. Soliz then agreed to try the heroin." (*Loera et al.*, *supra*, F027432, at p. 4.)

## Appellant Injects Heroin into Soliz

"Mitchell injected some of the heroin into McKiernan, an addict, and gave the remainder, about a half a gram, to [appellant]. [Appellant] divided the heroin into two one-fourth gram portions. He divided one of the portions into five or six 'dime bags' to sell the next day. He 'cold stirred' the remaining one-fourth gram in a small amount of water to prepare it for injection. Heroin prepared this way does not lose any potency as it does when it is heated. While [appellant] was preparing the heroin, Cordova said to him, 'Make sure you take care of him.' [Appellant] replied he would handle it. When McKiernan noticed the amount of heroin [appellant] was preparing he said, 'that's not just going to knock him out, that's going to kill him.' [Appellant] replied that was the idea.

"[Appellant] injected the prepared heroin into Soliz. Within three or four minutes, Soliz 'passed out' on the couch. His head fell back and his lips turned blue. At that point Mitchell, McKiernan, Mike and some of the others went outside. Cordova asked the group if anyone had a problem with what had happened. Mitchell assured him they did not.

"After dark, Cordova, Fuentes and Mike loaded Soliz into a car, drove out of town and dumped him over an embankment. Cordova thought Soliz was still alive and asked

Fuentes if he should shoot him.  Fuentes said no, that would look like murder.  Cordova threw a heavy rock at Soliz." (*Loera et al.*, *supra*, F027432, at pp. 4–5.)

**Discovery of Soliz's Body**

"Soliz's body was discovered the next morning.  The autopsy revealed he had suffered blunt trauma to the head and face but had died of morphine (derived from heroin) and methamphetamine intoxication.  The morphine level alone was sufficient to cause death.  Soliz's blood-morphine level was 688 nanograms/milliliter.  While regular users of heroin can survive that level, the toxic level for nonusers is greater than 100 nanograms/milliliter.  Soliz's blood-methamphetamine was 152 nanograms/milliliter.  Although the toxic range for methamphetamine is between 100 and 600 nanograms/milliliter, Soliz's level was not necessarily toxic, but he was under the influence of methamphetamine.  'Toxic' means has the potential for causing death.  Soliz also had a metabolite of marijuana in his urine, a blood-alcohol level of 0.02 percent and a gastric contents alcohol level of 0.57 percent.  The pathologist estimated Soliz died 30 to 60 minutes after receiving the heroin.  The parties stipulated the pathologist would have testified that heroin and morphine would be considered poisons.

"Cordova's mother testified that Cordova told her he and another man had killed a man in Porterville.  The man was 'snitching' on them about things they had done.  They had given the man an overdose of heroin, dumped his body and hit his head with a boulder.  He wanted her to tell the police he was in San Jose at the time of the killing.  She thought he said Mike had held the man down while he injected him.

"In March 1996, Jose Gonzales, who was serving a sentence at the Tulare County jail for petty theft with a prior, contacted detective Gene Pinon to provide information about a murder.  Gonzales was housed in a cell next to [appellant].  Gonzales told Pinon that [appellant] told him he had killed a 19-year-old boy.  The boy had been opening his mouth too much regarding some robberies.  He injected the kid with heroin while another man distracted him.  They dumped his body out of town.  [Appellant] told Gonzales if

6.

you do not do what the Northern Structure wants, they take you out. At trial, Gonzales testified Pinon put the words in his mouth and none of it was true." (*Loera et al.*, *supra*, F027432, at pp. 5–6.)

**Defense**

"[Appellant] did not testify or present any evidence in his defense. During summation, his counsel challenged the credibility of the witnesses implicating [appellant] in the killing and urged the jury not to find him guilty by association.

"Cordova did not testify. His only witness, an FBI agent who had interviewed Raul, testified to certain inconsistencies between Raul's statements to him and his trial testimony. In summation, Cordova's counsel argued the prosecution's evidence was not sufficient to support a finding of guilt beyond a reasonable doubt." (*Loera et al.*, *supra*, F027432, at p. 6.)

## PROCEDURAL BACKGROUND

On September 12, 1996, an amended information was filed in the Superior Court of Tulare County charging appellant and codefendant Cordova with count 1, murder of Ronnie Soliz (§ 187), with the special circumstance that they committed murder by administration of poison (§ 190.2, subd. (a)(19)), and an enhancement that they personally used a deadly weapon, a needle (§ 12022, subd. (b)).

Appellant was separately charged with count 2, furnishing a controlled substance, heroin (Health & Saf. Code, § 11352, subd. (a)); and that he had two prior strike convictions.

**Trial and Sentence**

On October 1, 1996, after a joint jury trial, Cordova was convicted of first degree murder with the special circumstance.

Appellant was found not guilty of count 1, first degree murder, and convicted of the lesser included offense of second degree murder; the jury was unable to reach a verdict on the deadly weapon enhancement. Appellant was convicted as charged in

count 2, furnishing heroin, and the court found he had one prior conviction. (*Loera et al.*, *supra*, F027432, at p. 6.)

On November 15, 1996, the trial court denied appellant's request to dismiss the prior strike conviction. Appellant was sentenced to 15 years to life, doubled to 30 years to life for count 1, second degree murder; the term for count 2 was stayed pursuant to section 654. (*Loera et al.*, *supra*, F027432, at p. 2.)

Cordova was sentenced to life without the possibility of parole. (*Loera et al.*, *supra*, F027432, at pp. 1–2.)

## Direct Appeal

On March 1, 1999, this court filed the nonpublished opinion in the joint appeal of appellant and Cordova that ordered correction of Cordova's abstract of judgment and otherwise affirmed the judgments. (*Loera et al.*, *supra*, F027432, at p. 30.)

## PETITION FOR RESENTENCING

On April 5, 2023, appellant filed, in propria persona, a petition for resentencing of his second degree murder conviction pursuant to section 1172.6, alleged he could not now be convicted of murder after the amendments to sections 188 and 189, and requested appointment of counsel and an evidentiary hearing. The trial court appointed counsel.

The prosecution filed a brief and conceded the jury was instructed on second degree felony murder, but argued appellant's petition still failed to state a prima facie case because he could have been convicted of murder based on implied malice and not imputed malice.

On September 27, 2023, the trial court issued an order to show cause and scheduled an evidentiary hearing.

## The People's Hearing Brief

On October 31, 2023, the prosecution filed a hearing brief and argued the trial evidence showed appellant personally murdered Soliz by injecting the lethal dose of heroin, and he acted with malice aforethought because he was a regular heroin user, he

8.

knew about the plan to kill Soliz, and McKiernan warned him that he was about to administer Soliz a lethal dose.

**Appellant's Hearing Brief**

On November 13, 2023, appellant filed a hearing brief and argued the prosecution could not prove beyond a reasonable doubt that he could still be convicted of murder with express or implied malice after the amendments to sections 188 and 189.

## EVIDENTIARY HEARING

On November 13 and December 4, 2023, the trial court conducted the evidentiary hearing. The court stated it had read the entirety of the trial transcript and the record was admitted into evidence. The parties called the following additional witnesses.

**Dr. Sarah White (White)**

The prosecution called White, a forensic psychologist with the Department of Corrections and Rehabilitation (CDCR), who interviewed appellant when she prepared the comprehensive risk assessment for his parole board hearing.

Appellant was 36 years old when he committed the offenses. He said he started injecting heroin during his freshman year of high school. When asked about the murder, appellant said, "he takes full responsibility for the crime and doesn't really like to talk about it." Appellant was not sure how he became involved in the murder but said, " 'I just took his life' " and " 'I just killed him.' "

White asked appellant why he did it. Appellant said: " 'There was no reason. There was no reason. I don't know myself. I can't give you no answer.' " White asked if someone told him to take the victim's life, and appellant said no.

White asked appellant what his motive was. Appellant said: " 'I was drinking. I was really intoxicated. I was using heroin. I was really out of it. I do remember injecting me, and I do remember injecting someone else. I really don't remember who it was. I was a drug addict, that's all it was—that's all I was, sorry.' " Appellant said he had been drinking alcohol and using drugs that night.

9.

**James Rouse, Jr. (Rouse)**

Appellant called Rouse, a licensed drug and alcohol counselor and specialist with Tulare County Health and Human Services. Rouse was familiar with heroin from prior personal use, and professional counseling with addicts for over 23 years. Rouse testified someone who had used heroin for 20 years would be an "old-time heroin user" and addict. If heroin was placed before an old-time user, a current user, or even someone in recovery, each person would use it because of their addiction.

Rouse was asked to describe how heroin is prepared. Rouse was only familiar with black tar heroin, which is sold in a ball, and could be swallowed, snorted, smoked, or injected. The only form of injection that he was aware of was "when they would heat it up and then the heroin … turns into liquid and then they suck it up with the syringe and then inject it." He continued, "It's been my experience that heroin is placed in a spoon. It is a solid form. It is heated up. There's a piece of cotton put in the spoon or the butt or the filter of the cigarette and it's drawn up into the syringe, and then it is injected into the person.

Rouse testified that aside from black tar heroin, heroin could also be sold in a solid form if it was liquified and then hardened up again into a ball. However, the substance could not be turned back into a liquid unless it was heated again.

Rouse never heard of the term " 'cold stir,' " or mixing heroin with water or any type of liquid and then injecting it. He was not familiar with preparing heroin by placing a piece in a spoon with water and then mashing it up in a liquid form. He was asked if such a preparation was possible, and explained that heroin had to be in a liquid form to be used in a syringe, and it would not be feasible to mix heroin and water in a spoon. He had never tried to mix heroin with a liquid because "it's very hard to take a piece of black tar heroin and make it liquid without heating it up. You have to melt it."

**Appellant's Hearing Testimony**

Appellant testified at the evidentiary hearing and said he had been a drug addict since he was young.

Appellant testified to the following account of the homicide. Appellant was at his mother's residence with Panchito and they were watching television. Cordova, Mike, McKiernan, Soliz, and Mitchell arrived together in a vehicle. Cordova asked if he could use appellant's residence to "shoot up some heroin." Appellant agreed if Cordova gave him some heroin to use.

Appellant said Cordova gave him a "small gram" of black tar heroin, that appellant believed was about two-thirds of a gram. Appellant used a razor and cut the substance in half, and then cut the pieces in half a second and third time, so there were eight pieces total. Each piece was roughly less than an eighth of a gram. Appellant picked a piece, and Soliz and Mitchell also picked their own pieces. Panchito wrapped up the remaining five pieces and put them away.

Appellant put his piece of heroin in a spoon, added water with a syringe, and "cooked it" with a cigarette lighter under the spoon, and the substance came to a boil. After it came to a boil, appellant put a piece of cotton in the spoon, and drew the liquid heroin into the syringe. Mitchell cooked his piece of heroin in the same manner, and Mitchell injected McKiernan.

Appellant did not see what Soliz did with his piece of heroin or how he prepared it, because appellant was facing the opposition direction from Soliz's location. Appellant testified that right before he injected himself, Soliz approached and asked for help to inject himself. Appellant agreed and said he would help after he finished his own injection.

After appellant injected himself, he told Soliz he was ready to help him. Soliz handed a syringe to appellant which was already loaded with heroin. Soliz tied his own

11.

arm with a bandana or a belt, and asked appellant to inject into the vein in the back of his forearm. Appellant followed Soliz's directions and injected him as instructed.

Appellant washed the spoon and syringes, and took out a pack of cigarettes. Soliz was sitting on the couch and "nodding out." Appellant asked Soliz if he was okay, and Soliz said yes. Appellant offered Soliz a cigarette and he accepted. Shortly afterward, the house's electricity went off because it was powered with an extension cord from next door, and somebody tripped over the cord.

Appellant and Cordova went outside, and Soliz stayed in the house. The lights went back on in the house after someone reattached the extension cord. Appellant and Cordova stayed outside. Fuentes came out of the house and told them that Soliz had "OD'd" and they had to take Soliz to the hospital.

Appellant testified he watched as Mike ran to the car and backed it up to the house, and the others loaded Soliz into the car. Fuentes asked appellant for directions to the nearest hospital. Appellant said there were two hospitals and the closest was in Exeter, but the directions were too complex. Instead, appellant gave directions to the hospital in Lindsay that was also nearby and easier to find. They took off and appellant stayed at the house.

Appellant admitted he had never told anyone this story before. Appellant testified that after he was interviewed by White, he was able to recall more details about Soliz's death while he was in a cell by himself in the prison's secured housing unit. Appellant also admitted that at his jury trial, the witnesses testified that Soliz was not a regular heroin user, and appellant mixed the heroin that was injected into Soliz.

### THE COURT'S DENIAL OF THE PETITION

On December 4, 2023, the court denied appellant's petition and made lengthy findings.

12.

"[T]he testimony given at trial by [Mitchell] is the most compelling and credible testimony and evidence that was offered during this [jury] trial.

"Even on this mostly cold record, [Mitchell's] testimony comes through as the most clear, consistent and reliable evidence that is available to me. [Mitchell] was inarguably not a very savory character who got himself involved in some very suspect activities here, but he was unsparing in his depiction of his own involvement there. He did not make much of an effort to spare himself when it came to his involvement in this … attempted drug manufacturing operation and the death of [Soliz].

"Based on my reading of the trial transcript, [Mitchell's] testimony is largely corroborated by the others who testified at the trial.

"[Mitchell] remained consistent in his testimony despite some very capable and aggressive cross-examination that he faced.

"Weighing against [Mitchell's] prior testimony is [appellant's] testimony during this proceeding. I do not find [appellant's] testimony here to be credible. The likelihood that he has accurately remembered some 20 years after the fact the scenario as described here today seems to me to be implausible, at best. The testimony is, of course, self-serving at this point given the benefit of the view of all the other evidence that has been presented thus far with plenty of time to think about it.

"His testimony is contradicted by the evidence given at trial that I find to be more credible. So I've largely remained unswayed by [appellant's] version of events that was given here today.

"The testimony offered by [Rouse] doesn't move me very much. His testimony as I understand it was limited to black tar heroin, but it becomes clear from reading the trial transcript that they were not dealing with black tar heroin when [Soliz] was killed. This was a powder form of heroin.

"There was repeated reference [at trial] to [Soliz] offering to snort this heroin which clearly indicates to me that it was powder. There was discussion of water being mixed with this heroin and cold stirred, as they said, to prepare the lethal dose. So I just don't find that [Rouse] adds much to the situation for me.

"It is undisputed here that [appellant] administered the injection that resulted in the death of [Soliz], and when it comes to evidence of his intent

13.

or mental state the [prosecution] have to prove in this case, I do find there is proof beyond a reasonable doubt that he acted with malice because you have two separate pieces of evidence that tell the court exactly what was going on in [appellant's] mind.

"His responses to [Cordova] and Mitchell and McKiernan amount in my view to proof beyond a reasonable doubt that [appellant] acted with the intent to kill and/or with conscious disregard for human life.

"As [Mitchell] testified, [appellant] started with half a gram of heroin. He split that half into two portions. He set aside one of those quarter-gram portions and split that into five or six bags, and he took the remaining quarter gram portion and cold stirred it. [Mitchell] testified that this resulted in a more potent dose as opposed to cooking it with flame.

"[Mitchell] testified that he did this at the direction of [Cordova]. [Cordova] commanded the victim, [Soliz], to slam this heroin, that is inject it, and not snort it as he offered.

"Crucially, [Cordova] said to [appellant], 'Make sure you take care of him,' and [appellant] responded that he would handle it.

"Also, critically, when [Mitchell] and [McKiernan], the other heroin user, realized how much heroin [appellant] was preparing in the shot that was destined for [Soliz], they told [him], 'That's not just going to knock him out, that is going to kill him,' and [appellant] responded … 'That's the idea.' …

"[Appellant] proceeded to administer the injection, and [Soliz] was unconscious within minutes thereafter.

"The statement that [appellant] made[,] 'that's the idea' is clear evidence in this court's view of intent to kill and/or an awareness that his act was likely to be lethal; that he acted with conscious disregard for the impact that act would have on [Soliz's] life.

"So I find beyond a reasonable doubt that he is guilty of second-degree murder."

On December 12, 2023, appellant filed a timely notice of appeal.

## DISCUSSION

As noted above, appellate counsel filed a brief with this court pursuant to

*Delgadillo* and *Wende.* The brief also included counsel's declaration that appellant was

14.

advised he could file his own brief with this court.[3] This court sent appellant an order that, pursuant to *Delgadillo*, the appeal would be dismissed as abandoned if he failed to submit a letter brief within 30 days. Appellant timely filed a letter brief with this court in response to our *Delgadillo* order, challenging the trial court's denial of his petition.

## I.  Senate Bill Nos. 1437 and 775

"Effective January 1, 2019, Senate Bill No. 1437 (2017–2018 Reg. Sess.) [(Senate Bill 1437)] amended the felony-murder rule by adding section 189, subdivision (e). [Citation.]  It provides that a participant in the qualifying felony is liable for felony murder only if the person:  (1) was the actual killer; (2) was not the actual killer but, with the intent to kill, acted as a direct aider and abettor; or (3) was a major participant in the underlying felony and acted with reckless indifference to human life.  [Citation.]  The Legislature also amended the natural and probable consequences doctrine by adding subdivision (a)(3) to section 188, which states that '[m]alice shall not be imputed to a person based solely on his or her participation in a crime.' " (*People v. Harden* (2022) 81 Cal.App.5th 45, 50–51; *People v. Strong* (2022) 13 Cal.5th 698, 707–708.)

"Senate Bill 1437 also created a special procedural mechanism for those convicted under the former law to seek retroactive relief under the law as amended," initially codified in former section 1170.95.  (*People v. Strong*, *supra*, 13 Cal.5th at p. 708; *People v. Lewis* (2021) 11 Cal.5th 952, 959.)  The initial version of former section 1170.95 permitted "a person with an existing conviction for felony murder or murder under the natural and probable consequences doctrine to petition the sentencing court to have the murder conviction vacated and to be resentenced on any remaining counts if he or she could not have been convicted of murder as a result of the other legislative changes implemented by [Senate Bill 1437]." (*People v. Flores* (2020) 44 Cal.App.5th 985, 992.)

---

**3**     Also in response to this court's order, appellant filed a request for appointment of a new appellate attorney, and complained that counsel filed a *Wende*/*Delgadillo* brief.  This court denied the request.

15.

Effective January 1, 2022, Senate Bill No. 775 (2021–2022 Reg. Sess.) (Senate Bill 775) made substantive amendments to former section 1170.95. (*People v. Birdsall* (2022) 77 Cal.App.5th 859, 865, fn. 18; *People v. Vizcarra* (2022) 84 Cal.App.5th 377, 388.) On June 30, 2022, the statute was renumbered as section 1172.6 without further substantive changes. (*People v. Saibu* (2022) 81 Cal.App.5th 709, 715, fn. 3.)

Section 1172.6, subdivision (a) states: "A person convicted of felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, attempted murder under the natural and probable consequences doctrine, or manslaughter may file a petition with the court that sentenced the petitioner to have the petitioner's murder, attempted murder, or manslaughter conviction vacated and to be resentenced on any remaining counts …."

"After the parties have had an opportunity to submit briefings, the court shall hold a hearing to determine whether the petitioner has made a prima facie case for relief. If the petitioner makes a prima facie showing that the petitioner is entitled to relief, the court shall issue an order to show cause. If the court declines to make an order to show cause, it shall provide a statement fully setting forth its reasons for doing so." (§ 1172.6, subd. (c).)

## II. The Evidentiary Hearing

"Once a petitioner establishes a prima facie case for relief and the superior court issues an order to show cause, the matter proceeds to an evidentiary hearing at which it is the prosecution's burden to prove beyond a reasonable doubt that the petitioner is ineligible for resentencing. [Citations.] If the superior court finds beyond a reasonable doubt that the petitioner is guilty of murder notwithstanding the amendments to sections 188 and 189, the petitioner is ineligible for relief under section 1172.6." (*People v. Vargas* (2022) 84 Cal.App.5th 943, 951 (*Vargas*).)

"At the hearing to determine whether the petitioner is entitled to relief … [t]he admission of evidence in the hearing shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed.  The court may also consider the procedural history of the case recited in any prior appellate opinion.  However, hearsay evidence that was admitted in a preliminary hearing pursuant to subdivision (b) of [s]ection 872 shall be excluded from the hearing as hearsay, unless the evidence is admissible pursuant to another exception to the hearsay rule.  The prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens.…"  (§ 1172.6, subd. (d)(3).)

At the evidentiary hearing, the trial court may make factual findings and credibility determinations, and weigh evidence.  (*People v. Harden*, *supra*, 81 Cal.App.5th at p. 51.)  "Although the parties may offer new or additional evidence to meet their respective burdens, section 1172.6, subdivision (d)(3) does not contemplate a whole new trial on all the elements of murder.  [Citation.]  Rather, '[t]he retroactive relief provided by [section 1172.6] is a legislative "act of lenity" intended to give defendants serving otherwise final sentences the benefit of ameliorative changes to applicable criminal laws and does not result in a new trial or increased punishment.'  [Citations.]  Thus, the focus at the evidentiary hearing phase of an 1172.6 petition is 'on evidence made relevant by the amendments to the substantive definition of murder,' which, in the context of section 188, requires 'the prosecution to prove that all principals to a murder [or attempted murder] acted with malice aforethought.' " (*Vargas*, *supra*, 84 Cal.App.5th at p. 952.)

## Review of the Trial Court's Ruling

"While the superior court acts as an independent fact finder in determining whether the People have met their burden, on appeal, the reviewing court applies the substantial evidence standard to the superior court's findings.  [Citation.]  Under this

17.

familiar standard, ' "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.] We determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [Citation.] In so doing, a reviewing court "presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' [Citations.] Substantial evidence also ' "includes circumstantial evidence and any reasonable inferences drawn from that evidence." ' " (*Vargas*, *supra*, 84 Cal.App.5th at p. 951.)

"In conducting our substantial evidence review, we begin with the presumption that the evidence was sufficient to support the trial court's ruling. 'Before setting aside the judgment of the trial court for insufficiency of the evidence, it must clearly appear that there was no hypothesis whatever upon which there was substantial evidence to support the verdict.' " (*Vargas*, *supra*, 84 Cal.App.5th at p. 952.)

### III. Appellant's Contentions

Appellant raises two contentions in his letter brief about the record and the trial court's findings at the evidentiary hearing.

### The Record

Appellant asserts that at the evidentiary hearing, the trial court mishandled the original transcripts from his jury trial, the transcripts were never given to defense counsel, and the court only turned over a flash drive to defense counsel that allegedly contained the record. Appellant speculates that the flash drive may not have contained the complete trial record and omitted evidence that was favorable to him, particularly Mike's trial testimony.

Appellant's speculations are undermined by the actual record. At the beginning of the evidentiary hearing, the trial court stated it had read the entirety of the trial record "in digital form" on a PDF provided by the People. The court asked the prosecutor to "put that on a flash drive or some other form of physical media, we can admit that as an evidentiary exhibit so it's part of the record if necessary on appeal. That way, it will be accessible the same exact version that we all had access to." The prosecutor agreed and defense counsel did not object.

At the conclusion of the evidentiary hearing, the trial court made its findings to deny the petition and extensively cited evidence introduced at appellant's jury trial. Defense counsel did not object or claim that he never received copies of the trial record. The electronic record was also transmitted to this court, and the appellate record contains the entirety of the trial evidence, including Mike's testimony.

**The Trial Court's Consideration of the Trial Evidence**

Next, appellant complains that at the evidentiary hearing, the trial court failed to consider Mike's trial testimony because it was favorable to him, it was consistent with appellant's hearing testimony, and it contradicted Mitchell's opposing trial testimony. Appellant further argues Mike's trial testimony showed appellant did not act with intent or malice, and that he may have been negligent instead.

Appellant asserts the trial court's failure to rely on favorable trial evidence shows that the court made an arbitrary and capricious ruling, and it was biased against him. Appellant also claims the court was biased because it found appellant's hearing testimony was not credible, and the court called him "a liar and a selfish person."

As explained above, when the trial court issues an order to show cause and conducts the evidentiary hearing, the court may consider the trial evidence and any additional evidence introduced at the hearing, weigh evidence, and make factual findings and credibility determinations. The statute does not contemplate an entirely new trial on the elements of murder. In reviewing the court's ruling at the evidentiary hearing, "[w]e

19.

must accept factual inferences in favor of the trial court's ruling. [Citation.] Where [the appellant] urges contrary and conflicting inferences, then, we must reject them." (*People v. Mitchell* (2022) 81 Cal.App.5th 575, 591.)

The trial court was not biased against appellant. At the conclusion of the evidentiary hearing, the court stated it had reviewed the trial record and made extensive factual and credibility findings to deny the petition. The court's factual findings are supported by overwhelming substantial evidence that appellant intentionally prepared a lethal dose of heroin and injected it into Soliz. In ruling on the petition, the court did not call appellant a "liar and a selfish person," but stated it was "unswayed" by appellant's hearing testimony and found he was not credible for specific reasons—that his hearing testimony was "self-serving" because he had the benefit of knowing about all the other evidence, he had with "plenty of time to think about it," his account was contracted by trial evidence, and it was "implausible" that appellant "accurately remembered" the facts 20 years after the incident.

## DISPOSITION

The trial court's order of December 4, 2023, finding beyond a reasonable doubt that appellant was guilty of second degree murder after the amendments to sections 188 and 189, is supported by substantial evidence, and his petition was properly denied.